**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

TIFFANY TATE; and QUANTUM )
LUXURY PROPERTIES, LLC )
                               )
                Plaintiff )      Case No.
                               )
        vs. )
                               )
IBIS PROPERTY OWNERS )
ASSOCIATION, INC.; and IBIS )
GOLF & COUNTRY CLUB, INC. )
                               )
             Defendants )
                               )

## <u>COMPLAINT</u>

NOW COMES Plaintiffs TIFFANY TATE ("Tiffany" and or "Tate") and QUANTUM LUXURY PROPERTIES, LLC, a Maryland limited liability company ("QLP") who sues Defendants IBIS PROPERTY OWNERS ASSOCIATION, INC. ("IPOA") and IBIS GOLF & COUNTRY CLUB, INC. (the "Club") and alleges and says as follows:

### JURISDICTION AND VENUE

1. This is all action that involves racial discrimination under the Fair Housing Act, 42 U.S.C. § 3604.

2. This Court has subject matter jurisdiction of Plaintiff's Federal law claims pursuant to 28 U.S.C. § 1331.

3. Plaintiff and Defendants reside in this judicial district and the events and omissions giving rise to Plaintiff's claims occurred in this district. Venue is proper in this district and divisions pursuant to 28 U.S.C. § 1391(b).

## PARTIES

4.  Plaintiff, TIFFANY TATE, is an African American and a permanent resident and resident of the state of Maryland.

5.  Plaintiff, LUXURY PROPERTIES, LLC is a Maryland limited liability company with its principal place of business located at 312 Willow Oak Circle, Pikesvile MD 21208.

6.  Defendant IBIS PROPERTY OWNERS ASSOCIATION, INC. is a Florida Corporation organized under the laws of Florida.  Its principal and registered offices are located at 9055 Ibis Blvd., West Palm Beach, FL 33412 and it regularly carries on business in Palm Beach County, Florida and the Southern District of Florida.

7.  Defendant IBIS GOLF & COUNTRY CLUB, INC. is a Florida Corporation organized under the laws of Florida.  Its principal and registered offices are located at 8225 Ibis Blvd., West Palm Beach, FL 33412 and it regularly carries on business in Palm Beach County, Florida and the Southern District of Florida.

## FACTUAL ALLEGATIONS

8.  In March of 2015, Plaintiff Tate along with three (3) White companions and a White realtor, met in person with John Jorritsma, Director of Sales and Marketing for Defendant Club.  The purpose of this meeting was to learn about the possibility of shared homeownership and club membership with the West Palm Beach, Florida country club that is owned and operated by Defendants IPOA and Club. Jorritsma, employed by Defendant Club, enthusiastically welcomed Plaintiff Tate, her group of white business associates, and her ideas. Jorritsma specifically explained to Plaintiff

Tate and her white companions the potential for Club Membership that existed with respect to biologically unrelated owners of a single property.

9. In April of 2015, Plaintiff Tate ultimately purchased the home, which is located at 8152 Sandpiper Way and had been the subject of the discussion with Jorritsma. This purchase was made by Plaintiff Tate, in partnership with four (4) other persons. Only one (1) of these 8152 Sandpiper Way co-purchasers had actually accompanied Plaintiff Tate on her original visit to the Club membership office in March of 2015. Three (3) of Plaintiff Tate's four (4) ultimate 8152 Sandpiper Way co-purchasers are Black people. The one (1) White co-purchaser had attended the March 2015 meeting that involved Jorritsma and Plaintiff Tate.

10. In March 2015, Tate and three co-owners formed an LLC, Sandpiper Strategies, LLC, a Maryland LLC, to purchase the 8152 Sandpiper Way home. In completing the membership application, Plaintiff submitted the organization's Operating Agreement, which identifies five (5) co-purchasing owners and describes in detail the shared use arrangement contemplated for the home. This submission was made in response to Michele Bucolo's (Membership Director for the Club) statement that the Club Board of Directors required review of the purchasing entity's governing documents in order to approve membership.

11. On April 29, 2015, Bucolo notified Tate that, pursuant to the board's review the Board had approved Sandpiper Strategies, LLC's membership application, and allowed this multi-member LLC., to purchase the 8152 Sandpiper Way property.

12. In April of 2015, Tate, inquired with the Club's leadership about the possibility of converting a second home she had purchased into a shared ownership

arrangement. Ms. Tate relied upon the fact that the Defendants had approved the shared ownership of the 8152 Sandpiper property, when she decided to purchase other property in the Ibis development. Ms. Tate reasonably relied on defendants' course of conduct regarding 8152, specifically the Defendants' agreement to a plan of shared ownership, when Ms. Tate purchased a property located at 7717 Azalea Court, within the Ibis community (hereinafter the "Premises" and or "7717 Azalea").

13. The initial plan for the 7717 Azalea was to accommodate up to six (6) buyers who would establish a single-entity LLC and participate as the LLC's members.

14. Plaintiff Tate contemplated that LLC membership for co-purchasers of the 7717 Azalea Court home would provide to each LLC member the shared use of the home and Club membership, identical to the Club board-approved arrangement under which she resided in Ibis and enjoyed Club benefits through her ownership of the 8152 property.

15. Tate planned to purchase and operate the 7717 property using precisely this same arrangement that the Defendants had approved for her personal home in the Ibis community, 8152 Sandpiper Way. The Plaintiff believes, and therefore alleges, that the Defendants believed Ms. Tate was in partnership with ONLY white partners in the 8152 property.

16. Plaintiff Tate believes, and therefore alleges the Defendants approved the shared ownership and shared Club membership of the 8152 property based on the Defendants' belief that Ms. Tate was the only black partner.

17. On June 2, 2015, Plaintiff Tate, accompanied by a White business associate, formally presented to Jorritsma, and Bucolo the full details of the shared ownership concept, for the 7717 Azalea property.

18. Under this plan, a company called Quantum Luxury Properties (QLP) would administer the ownership and management of the 7717 Azalea.

19. During the meeting, Tate explicitly stated verbally and in written presentation her intent to launch the program in the early part of July 2015.

20. The Club leadership was supportive and offered suggestions with respect to the manner in which Club bylaws and policies could be leveraged to maximize the use of membership for a shared arrangement. One suggestion included employment of Legacy Membership. During this meeting, Tate had not mentioned the possibility that some of the contemplated owners would be black. Therefore, Tate believes and therefore alleges that the Defendants believed that the other investor/owners of the 7717 Azalea property would be white.

21. According to standard club membership terms, as many as two (2) adults may be designated as "Member Designee" and "Member Second." An unlimited number of minor children are also allowed to be Club members. Legacy Membership in the club is reserved for up to two (2) additional adults residing in a household where a Member Designee and Member Second already exist.

22. Upon information and belief, the Plaintiffs believe and therefore allege that the Defendants encouraged the Plaintiffs to use "Legacy Membership", for the 7717 Azalea property when the defendants believed that all the owners of the 7717 Azalea property LLC would be white.

23. Within its governing documents, Defendant IPOA specifically maintains that criteria for club membership are "ministerial" in nature. As a practical consequence, the Defendants normally only collect information that is "reasonably required for Country Club records".

24. During Plaintiff Tate's meetings with Defendants, including the June 2, 2015 meeting, Defendants specifically shared with Plaintiff Tate the manner in which QLP's plan could be brought to fruition, namely utilizing Legacy Memberships to extend full memberships to two additional co-owners.

25. On at least two (2), independent occasions, Bucolo, the Club's Director of Membership, told Tate that Defendants had "*never denied membership to anyone.*" To the best of the Plaintiffs' knowledge, all of these conversations took place when the Defendants believed that Ms. Tate's business associates and co-owners were white.

26. On June 5, 2015, Plaintiff Tate sent correspondence to Jorritsma and Bucolo, thanking them for their time and confirming the fact that she would limit her initial 7717 Azalea Court shared ownership arrangement to four (4) members.

27. Such a limitation was jointly calculated by Ms. Tate, Mr. Jorristsma and Ms. Bucolo, to easily comply with Defendants' membership Bylaws related to Legacy Membership. Plaintiff also reiterated the plan to officially launch in early July of 2015 the program that would provide for the purchase of the 7717 Azalea property by an LLC.

28. The plan for the sale of 7717 Azalea, and consequential access to Club membership, was identical to the arrangement for the 8152 property.

29. The Defendants had approved and encouraged the purchase of the 8152 property when they perceived that all the owners/members of Sandpiper Strategies, LLC-- except for Ms. Tate were white.

30. Also on June 5, 2015, Plaintiff Tate proceeded with high-quality, costly upgrades to the 7717 Azalea Court property. Said upgrades were performed in anticipation of Plaintiff's planned sale of the property to a single entity LLC through QLP, which would have been significantly more lucrative than selling it to a more traditional buyer.

31. Plaintiff would not have made such upgrades had she not received the supportive reception from the Club during the June 2 meeting.

32. Ms. Tate reasonably relied upon the Defendants' prior approval of the purchase and membership arrangement for the 8152 property and supportive position expressed during the June 2 meeting when she made high-end improvements to the 7717 property.

33. Between June 2, 2015 and July 20, 2015, Plaintiff Tate provided several written and verbal updates on the plan for the 7717 Azalea property to Defendants' agents.

34. Plaintiff Tate received constructive comments and assistance with the QLP business plan for the 7717 Azalea property from Defendants Jorritsma and Bucolo.

35. Jorritsma, Bucolo, and Michael Tobin also provided assistance to Plaintiff Tate by clarifying membership guidelines, offering comments concerning Plaintiff-authored promotional materials and providing hardcopies and electronic versions

of Defendants' own membership documents and promotional materials, including the membership application.

36. Upon information and belief the Plaintiffs believe and therefore allege that the Defendants did not know that Ms. Tate intended to invest/own the property with other black people.

37. By way of anecdote, between April of 2015 and August of 2016, Plaintiff Tate, Novella Tascoe, and the co-purchasers of the 8152 Sandpiper Way home in the Ibis community have used Defendant Club amenities five to ten (5-10) times per month. During these visits, collectively, Tate and her co-purchasers have observed fewer than ten (10) Black people who appear to be Ibis community owners, Ibis community prospective owners, or Ibis community club guests. Plaintiff Tate has visited Defendant Club's membership office on approximately ten (10) occasions between April 1, 2015 and August 22, 2016. During those visits, Tate, her co-owners, and guests never encountered a Black person appearing to be an Ibis community owner, prospective Ibis community owner, or guest. Between 2005 and 2015, while Plaintiff Tate visited the Ibis community on an annual basis as a peak season guest, she encountered fewer than five (5) Black people appearing to be owners, prospective owners, or club guests within the Ibis community.

38. Between the June 2, 2015 meeting, during which Defendant Club positively received the business plan for the 7717 Azalea property, that Plaintiff presented on behalf of QLP, and July 25, 2015, when Defendants' actions which serve as the foundation of this Complaint were manifested, a relatively high number of

Black people visited Defendant Club's membership offices and amenities to formalize their membership or assess the shared ownership opportunity. These visits are specifically documented with Ibis POA visitor log records.

39. On or about June 11, 2015, Novella Tascoe visited Defendant Club's membership office for the first time. The purpose of this visit was to retrieve her Club identification card.  Upon information and belief, Plaintiff believes and therefore alleges that this was the first time either Defendant IPOA, Defendant Club, or any of the individual defendants, became aware that at least one of Plaintiff's co-owners is Black. Shortly after the Defendants met Ms. Tascoe, the Defendants' attitudes toward the Plaintiffs began to show a sudden and dramatic change for the worse.

40. On or about June 20, 2015, three (3) Black women, who were Plaintiffs' guests, went to Defendant Club's membership office to retrieve guest passes.  These Black women specifically inquired about membership privileges in the context of a shared ownership arrangement during their visit.

41. On June 26, 2015, a Black male went to Defendant Club's membership office, to inquire about the process of obtaining membership.  During his inquiry, this individual discussed the fact that he was assessing a potential shared ownership arrangement that Ms. Tate and QLP had presented to him.  As stated in the preceding paragraphs, the Defendants had, for all practical purposes, approved and encouraged this shared ownership arrangement as to both the 8152 property and the 7717 Azalea property; at least while the Defendants believed the majority

of the owners/investors were white. During that visit, Club staff acknowledged awareness of the opportunity offered through QLP.

42. On July 7, 2015, a Black couple identified as Plaintiff Tate's guests, visited several of Defendant Club's facilities. This couple perused Defendant Club's amenities, inquired about potential homeownership and investigated the prospect of obtaining Defendant Club membership.

43. Plaintiff Tate met in person with the Club Membership Director, Bucolo, on July 8, 2015, in order to provide an update on the implementation of the business plan. Tate informed Bucolo that QLP had pre-sold all shares of the 7717 Azalea Court property.   During this meeting, Plaintiff informed Defendant Bucolo that the White business associate, who had accompanied Plaintiff with respect to the June 2, 2015 meeting, was no longer involved in the project.

44. On or about July 21, 2015, a Black adult male and two (2) Black adolescents visited Defendant Club's membership office. The purpose of the visit was for one of the children, a member of Tate's household, to have her photo taken and placed upon a Defendant Club membership identification card.

45. On July 25, 2015, immediately upon the heels of the markedly increased frequency and presence of Black people within the Ibis community, Jorritsma called Tate. Without prior warning, Jorritsma informed Plaintiff Tate that Defendant IPOA and Defendant Club had each withdrawn support from QLP's business plan. This business plan, which Defendants had approved in contemplation of Plaintiff's participation with White co-purchasers, had outlined the selling of Plaintiff Tate's 7717 Azalea Court property to a single entity. The

single entity purchaser of the 7717 Azalea Court property would have enjoyed shared ownership and access to Defendant Club membership through a combination of standard and Legacy Club memberships—the arrangement that has been suggested by Bucolo, Club Membership Director, at the June 2 meeting, before Bucolo and the other Defendants knew that the potential investor/owners would include a significant number of black people

46. At no point in time, prior to July 25, 2015, did either Defendant IPOA or Defendant Club ever suggest to Plaintiffs that the concept that the contemplated shared ownership plan for the 7717 property, was, or even that it could potentially become, a violation of the covenants or Bylaws associated with either Defendant IPOA or Defendant Club. This shared ownership plan, and shared Club Membership plan, was essentially identical to the plan for the 8152 property, that the Defendants had approved.

47. Upon information and belief, the Plaintiffs believe and therefore allege that The Defendants only raised objections to the shared ownership plans AFTER they learned that the potential owner/investors included a significant number of black people. When the Defendants, apparently, believed the owner/investors would be white, or primarily white, the Defendants allowed, encouraged, and assisted the Plaintiffs' shared ownership plans.

48. In a letter dated July 31, 2015, Steven Rappaport, an attorney with the Sachs Sax Caplan ("SSC") law firm, alleged that Plaintiffs Tate and QLP were allowing occupancy of the home on a "transient basis." This letter was written to Plaintiff on behalf of Defendants. The letter continued to aver that Plaintiff's group was

engaged in an effort to allow multiple persons or multiple families to occupy the same home over the course of a given year. Through reference to Article VII, Section 4 of the Declaration of Covenants, Restrictions and Easements for Ibis Golf and Country Club (the "By-Laws"), Mr. Rappaport falsely alleged that Plaintiff was acting in "violation of law, ordinance, statute, regulation or rule of any governmental authority having jurisdiction over the Property or portion thereof…".

49. In this letter of July 31, 2015, Mr. Rappaport further accused Plaintiffs Tate and QLP of violating Article VII, Section 36 of the Bylaws. That section provides, in part, that "[e]ach residential unit shall be occupied as a residence for a single family. For purposes of this section, the term 'family' means a group of persons who are related to one another by blood, marriage, or adoption in the following degrees of kinship only: children, grandchildren, parents, brothers, sisters, aunts, uncles, nieces and nephews. A "family" may also consist of "two (2) single unrelated persons and other persons related to them in the degrees of kinship described above. No more than two (2) families or a single entity may be the owner of a residential lot at any time."

50. As a consequence of this definition, four (4) unrelated people may occupy a single residence. Of note, a single entity can also consist of an unspecified number of people.

51. Plaintiff was specifically and falsely accused of "allowing occupancy of its lots within Ibis on a transient basis and by more than one single family as defined by the Declaration."

52. The Defendants were aware that the 8152 property was owned by an LLC with multiple members.

53. Upon information and belief, the Plaintiffs believe and therefore allege that the Defendants permitted and approved in writing this ownership structure, until they learned that more than one black person might occupy a home within the Ibis community through the shared ownership arrangement, at which time they actively sought out ways to exclude out the previously enthusiastically supported project.

54. Through this July 31, 2015 letter, Defendants demanded that Plaintiffs Tate and QLP cease and desist from permitting more than one single family to potentially occupy the 7717 Azalea Court property, due to an alleged violation of the Bylaws. This July 31 letter threatened Ms. Tate with legal action, unless she removed the identification of any Ibis community properties from the websites for which she was responsible, as well as from other advertising on the Internet and any other electronic or written publications, upon pain of "mandatory mediation," injunctive action and payment of Defendants' costs and attorney's fees.  However, nothing on Ms. Tate's website identified the properties advertised as being part of the Ibis development.

55. During the month of August, 2015, Plaintiff Tate learned that white members of Defendant Club had verbally objected to the increased Black presence, as it was an indication of the potential proliferation of Black members of Defendant Club that might occur if Plaintiff was not stopped.

56. Upon information and belief, Plaintiffs believe, and therefore allege that these White club members expressed their racist and hostile views to the board member, officers and officials of each Defendant. The Defendants in turn, withdrew the support for Plaintiff's shared ownership plan of her properties, as early as July 25, 2015.

57. Upon information and belief, the Plaintiffs believe and therefore allege that Defendants withdrew their support of the Plaintiff's shared ownership plan primarily, if not exclusively, to prevent black people from purchasing properties and Club memberships in the Ibis development.

58. Upon information and belief, the Plaintiffs believe and therefore allege, that this accusation of selling "fractional Ibis ownership" was and is merely a pretext for the Defendants' racist scheme to exclude black people from the Ibis community.

59. When Defendant Club and Defendant IPOA withdrew their support and ordered Plaintiffs Tate and QLP to terminate its contemplated shared ownership program for the  7717 Azalea Court property, Plaintiff Tate already had invested a great deal of money in luxury upgrades to the property.  Plaintiff Tate had invested and made these improvements in reliance upon Defendants' prior approval of the shared ownership plan as to the 8152 property, and in reliance upon the Defendants' prior support and encouragement for such a plan as to the 7717 property; that support and encouragement came BEFORE the Defendants learned that Ms. Tate was not the only black owner/investor of 8152 Sandpiper and that a large number of black people might take advantage of the shared ownership opportunity of the 7717 property. Ms. Tate had made these costly improvements

over the course of several weeks, amounting to tens of thousands of dollars. Furthermore, the Plaintiff had entered into a sales agreement with QLP to purchase the home from her for $249,000.

60. On August 12 and 13,  2015, Phillip Gildan of the Greenberg Traurig law firm, sent a letter to the Plaintiffs, in an additional effort to disrupt Plaintiff Tate's home development efforts.  Defendants, through attorney Gildan, accused Plaintiff Tate of making misrepresentations via website, regarding membership in Ibis Golf & Country Club, Inc. and accused her of making misrepresentations about the ability of "fractional share" owners/members of Plaintiff's QLP group to use the Club.

61. In truth, Plaintiff QLP has never sold, offered to sell or referenced "fractional shares" relative to Defendants' properties.

62. The individuals who were assembled by QLP would be owners of a single entity LLC, and that single entity, LLC., would own the property as permitted by the Ibis Bylaws, and as allowed previously when the club believed the majority of participants would be White.

63. In the letter of August 12, 2015, Mr. Gildan claimed that the issue of Club membership created potential harm to Ibis "goodwill" and "reputation".

64. Upon information and belief, the Plaintiffs believe and therefore allege that these alleged concerns about "goodwill" and "reputation" are merely a pretext for the Defendants' Defendants' unspoken, de facto policy of excluding black people from the Ibis community, or at least minimizing the number of black people in the community.  There is no significant difference between the people utilizing the

club and membership that could in any way effect "goodwill" and "reputation" other than the potential change in racial makeup by adding Black Members and guests.

65. Upon further information and belief, the Plaintiffs believe and therefore alleged that the restrictions described in Mr. Gildan's letter of August 12, 2015 were never directed toward similarly situated, White Club members engaged in the process of selling Ibis properties to single entities.  These restrictions de facto targeted Black potential buyers.

66. On August 13, 2015, Tate called Jorritsma to ask that Defendants support the sale the 7717 Azalea Court property since she already had invested in the improvements and Plaintiff QLP had secured buyers for that property.  Plaintiff reminded the Defendant Jorristma that the proposed LLC ownership arrangement for the 7717 property was consistent with Defendant's Bylaws; it was identical to the 8152 Sandpiper Way arrangement, under which she already resided.

67. Jorritsma told Plaintiff Tate that she could submit an application but, ultimately, Defendants would not approve it. Jorritsma's statement is in direct violation of Defendants' published membership application process, which states applications are to be submitted to the Board of Directors, prior to an acceptance decision about membership.

68. Based on Jorritsma's statement, and based on the other facts set forth in this Complaint, Plaintiffs believe and therefore allege that the Defendants approved the shared ownership plan for the 8125 property because they apparently thought the majority of the investor/owners were white, and Defendants rejected that same

plan for the 7717 property because they believed the majority of the owners would be black.

69. On August 19, 2015, LoGiudice, Chief Operating Officer and General Manager of the Club at Ibis, wrote a letter to Plaintiff Tate. This letter acknowledged Plaintiff Tate's month's long communications with the Defendants about the shared ownership plan and the August 13, 2016 meeting Plaintiff Tate attended with two Club staff members and two Board members to discuss the prospect of continuing the implementation of her business plan. Defendant LoGiudice informed Plaintiff Tate that the Defendants rejected Tate and QLP's plan to offer Equity membership privileges to owner/investors who purchased the 7717 property as part of an LLC. This rejection was made in spite of the fact that the Defendants had approved such Equity Membership privileges for the 8125 property, had initially supported the plan for 7717 property.

70. Upon information and belief, the Plaintiffs believe and therefore allege that Defendants had granted membership privileges to similarly situated non-black people.

71. Defendant LoGiudice proffered the pretext that the Ibis Bylaws prohibited Plaintiffs' proposed ownership structure for the 7717 property.

72. The reversal of support directly contradicts the Defendants' prior acceptance of the same ownership structure for the 8152 property.

73. Upon information and belief, the Plaintiffs believe and therefore allege that the only difference between the Defendants' approval of the 8152 property, and the Defendants' rejection of the ownership plan of the 7717 property is that the

Defendants apparently believed that the 8152 property had only one black owner and several white owners, and the 7717 property was owned by a majority of black people.

74. On September 3, 2015, Defendant IPOA's counsel sent a communication acknowledging their understanding that the business plan entailed selling the 7717 Azalea Court property to a single entity, an LLC, an arrangement that is permitted within the Bylaws and covenants held by Defendant IPOA and Defendant Club. This contradicts the Defendants' prior communications that had asserted the Plaintiff would be selling fractional ownership. This letter of September 3, 2015 shows that the Defendants prior claims that Plaintiffs' plans for the 7717 property violated the Bylaws was wrong, and it strongly suggests that the Defendants knew, or should have known that this position was wrong.

75. After dealing with the immediate negative economic and business relation consequences resulting from the Defendants' abrupt and inexplicable withdrawal of support for her plan to sell the 7717 property to an LLC., , Plaintiff Tate was forced to place the 7717 Azalea Court property on the general real estate market. Based upon Defendants' actions, as herein described, during the remainder of the Fall and Winter of 2015-2016, continuing through Spring 2016, Plaintiff Tate was forced to initiate several significant price reductions, in order to promote the sale of the 7717 property on the general market.

76. Plaintiff Tate purchased the 7717 Azalea Court property under the Defendants' Varied Equity Home Renovator program. Defendants' Varied Equity Home Renovator and Varied Equity Short Sale programs provide for an investor to

acquire a foreclosed, short sale or distressed property, solely as determined by Defendant IPOA and Defendant Club. These programs are designed to attract developers to distressed homes and spare them the costs associated with full membership joining fees and dues for a one year to permit the investor to make renovations to the property and sell the property.

77. During the Home Renovator's  Initial Period, twelve months in the case of the 7717 property,   no annual dues or capital or operating assessments associated with the membership are due from the renovator, unless the property is converted to a fully-paid Varied Equity Short Sale Membership during the period.   If the dwelling has not sold during the Initial Period, and the renovator has not made the final installment payment of the membership, the renovator must choose a category of membership and make the final installment payment for membership due under this Plan within seven (7) days of the end of the Initial Period. Once the final payment is made, the renovator shall assume all rights and obligations as a full member.

78. Plaintiff Tate purchased property at 7717 Azalea Court, under Defendant's 'Varied Equity Short Sale Plan for the purpose of resale to a single entity applying a shared ownership arrangement within the allotted twelve-month period.

79. The Defendants' abrupt withdrawal of support for the shared ownership arrangement prevented Plaintiffs from selling the 7717 property to the LLC, as Plaintiff had planned.

80. This sudden withdrawal of support for the original business plan caused significant administrative and business consequences for Plaintiff, which delayed placing the property on the general market for at least four (4) months.

81. The Defendants' abrupt reversal of their prior approval of the plan to sell the 7717 property to an LLC. made it impossible for Plaintiff to sell the 7717 property within the Initial Period. As a result of the delays, that the Defendants caused by withdrawing approval of the original plan to sell 7717 to an LLC., Plaintiff was forced to purchase  an Equity Membership and submit  an Equity Membership application, pursuant to Article X, Section 5 b, pages 21-24 of the IPOA/Club By-laws.

82. As a result of the delays in the sale of the 7717, resulting from the Defendants' sudden and apparently racially-motivated withdrawal of their approval of the original plan to sell the property to an LLC., Plaintiff Tate could not sell the property within the aforementioned  twelve (12) month window to sell the property without buying a membership.  Because Plaintiff had only seven (7) days to make her membership selection and pay off her Promissory Note, Plaintiff was forced into default of the membership that had been deferred under the Renovator Program, effective June 4, 2016.

83. On May 23, 2016, in advance of the end of the twelve (12) month period, Plaintiff Tate applied with Defendant IPOA and Defendant Club for an extension on her Renovator's Program. No aspect of the Defendant Club Bylaws, Defendant IPOA Bylaws or the Renovators' program application prohibits such an extension.

84. On May 28, 2016, Plaintiff's club Membership privileges were suspended. This suspension was made possible by an amendment to the 2015 Bylaws. This amendment was ratified in April 2016.

85. Per this amendment, if an "Equity Member" is required to purchase another membership and does not, that membership (which is in good standing) will be suspended.

86. Although Plaintiff is not an Equity Member as defined by Defendant Club's Bylaws, Defendant Club elected to apply this definition to exclude Plaintiff from Defendant Club.

87. Upon information and belief, the Plaintiffs believe and therefore allege that this amendment was ratified specifically to prejudice Plaintiff's exercise of Membership privileges, stemming from Plaintiff's ownership of three (3) homes in Ibis, subject to Defendant IPOA and Defendant Club By-Laws.

88. On June 27, 2016, Plaintiff Tate traveled to West Palm Beach from Maryland for the express purpose of personally requesting an extension for the Renovator's application from the Club Board of Directors. On two (2) separate occasions in advance of the meeting, Plaintiff provided written explanations of the fact that requesting an extension from Defendant Club's Board of Directors was the sole purpose of her June 27, 2016 trip to Florida.

89. The justification for Plaintiff's request for an extension was the inability to sell the 7717 Azalea Court property as contemplated in the business proposal Plaintiff presented to Defendant IPOA and Defendant Club on June 2, 2015.

90. Previously described delays with respect to the placement of the 7717 Azalea Court property on the general market were directly caused by Defendants' decision to renege promised support for Plaintiff Tate and QLP's shared ownership program.  At the conclusion of her request presentation, Defendants advised Plaintiff they would apprise her of their decision "in a couple of days."

91. On July 1, 2016, having not received a decision from the Defendants following four days of deliberation, Plaintiff Tate contacted LoGiudice to inquire about the status of her extension request.

92. On July 5, 2016, eight (8) days following Plaintiff's formal request, Defendant Club denied Plaintiff's request for a Renovator's Program application extension. Defendants cited a multitude of inconsistent explanations, through a series of communications, before ultimately stating that Defendants simply do not allow extensions.

93. Defendants have rebuffed Plaintiff's requests for documentation, within Defendants' By-Laws, that supports the rejection of Plaintiff's extension application.  In rendering this decision, the Defendants also understood that requiring Plaintiff to purchase a membership would expose Plaintiff to in excess of $25,000 of non-refundable expenses associated with purchasing an extraneous membership.

94. Upon information and belief, the Plaintiffs believe and therefore allege that the Defendants proffered explanations, including but not limited to their belated claim that the Defendants simply did not allow extensions, was merely a pretext to conceal their racist policies.  Despite their ultimate claim that they did not  allow

extensions, the Defendants accepted Plaintiff's request for a meeting regarding the matter and allowed her to incur expenses to travel from Maryland to the meeting.

95. In December 2016, without legal or contractual justification, Defendant Club, through the home sale estoppel process, withheld more than $30,000 from the proceeds of Plaintiff's Tascoe Tate Family Trust's sale of the 8152 Sandpiper Way property.   This was done under the incorrect assertion that a Club membership should have been purchased on the property, despite it being exempted by the IPOA Covenants.

96. In the days leading up to the sale, Plaintiff Tate, on behalf of the Trust, challenged the Club to prove and substantiate its rights to the proceeds from the sale. Additionally, she implored the IPOA to intervene in her favor and they refused, despite Defendants Club and IPOA acknowledgement that they had no evidence to refute the Plaintiff's claim that Plaintiff had not exhausted the exemption extended to transfers through devise or inheritance.

97. The proceeds were taken in a manner that left Plaintiff's Trust no recourse as continued protests on their part would have stopped the sale, exposing the Plaintiffs to a claim of breach of contract by the prospective buyers.   The Plaintiffs believe, and therefore allege, that this the Defendants' wrongful claims against the sale proceeds of the 8152 property was part of the ongoing and continuing racial discrimination and harassment that the Defendants had perpetrated against the Plaintiffs since at least July of 2015.

98. After the Defendants' long course of apparently racially motivated actions detailed above, the Defendants revised their bylaws and Covenants to prohibit the activities that were permissible when the Plaintiffs attempted them.

99. In doing so, the Defendants concede that Plaintiffs' activities, transactions, and plans were permitted under the prior versions of the Club and IPOA governing documents.

100.    Upon information and belief, the Plaintiffs believe, and therefore allege, that these changes to the Bylaws and Covenants were racially motivated and intended to exclude, or at least strongly discourage, black people from purchasing property and memberships in the Ibis development.

**COUNT I**
**VIOLATION OF VIOLATION OF THE FAIR HOUSING ACT,**
**42 U.S.C. § 3601, ET SEQ. ON THE BASIS OF RACE**

101.    The allegations of Paragraphs 1 through 100 are hereby re-alleged as if fully set forth herein.

102.    Tiffany is an "aggrieved person" as that term is defined pursuant to 42 U.S.C. § 3602.

103.    QLP is an "aggrieved person" as that term is defined pursuant to 42 U.S.C. § 3602.

104.    The 7717 Property is a "dwelling" as that term is defined pursuant to 42 U.S.C. § 3602.

105.    Defendant IBIS PROPERTY OWNERS ASSOCIATION, INC. committed a "discriminatory housing practice", as that term is defined pursuant to 42 U.S.C. § 3602 by and through the following acts:

    a.  Refusing to permit Tiffany from selling the dwelling to QLP so that African Americans would not become members of IPOA; and

    b.  Refusing to permit QLP to purchase the dwelling so that African Americans would not become members of IPOA;

106.   Defendant IBIS PROPERTY OWNERS ASSOCIATION, INC. committed a "discriminatory housing practice", as that term is defined pursuant to 42 U.S.C. § 3602 by and through the following acts:

    a.  Refusing to permit Tiffany from selling the dwelling to QLP so that African Americans would not become members of IPOA; and

    b.  Refusing to permit QLP to purchase the dwelling so that African Americans would not become members of IPOA;

107.   The Defendant's acts, including those through their employees and/or agents as described herein, violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3604(a), (b) and (c) in that they:

    a.  constitute a refusal to sell real property, including appurtenant homeowners' association membership privileges, free from discriminatory covenants and otherwise make housing unavailable on the basis of racial status in violation of 42 U.S.C. § 3604(a);

    b.  provide different terms, conditions, and privileges for the purchase of housing properties, as well as different requirements and rules in connection therewith, on the basis of racial status in violation of 42 U.S.C. § 3604(b); and

    c. make statements and advertisements, including those made by their employees and/or agents, as described herein, that effectively express a preference and/or limitation on the basis of racial status in violation of 42 U.S.C. § 3604(c).

108. The foregoing conduct of Defendants constitutes discrimination against any person in the terms conditions, and privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of racial discrimination.

109. Defendants' conduct in refusing to permit African Americans to purchase property in the community, specifically permitting the purchase of the dwelling from Tate is a unduly restrictive limitation on the purchase of property in the Ibis community which places each plaintiff and the class in danger of being dispossessed of their property rights to purchase and sell in the Ibis community.

110. The Defendants actions were intentional and in total and reckless disregard of the Plaintiff's federally protected rights.

111. The Defendants' actions were intention or with reckless disregard of the rights of American Americans.

112. As a result of the unlawful discrimination, the Plaintiff have suffered damages.

WHEREFORE, the Plaintiffs demand judgment against the Defendants for actual damages, punitive damages, attorney fees and cost and injunctive relief to prevent discrimination to African Americans as follows:

    A. Find that the Defendants violated the Fair Housing Amendments Act by treating the Plaintiffs and African Americans differently from Caucasian purchasers by

and through discriminatorily interpreting their rules and regulations to restrict the amount of African Americans in the Ibis community, including an unduly restrictive application procedure;

B.  Find that the Defendants acts were intentional, outrageous, willful and wanton, beyond all bounds of a civilized society, and in reckless disregard of the Plaintiffs' civil rights under law;

C.  Find that Plaintiffs are entitled to an award of attorneys' fees and costs, and reserve ruling as to the amounts and the applicable multiplier until the conclusion of the trial on this matter;

D.  Enjoin Defendants from discriminating against Plaintiffs or any other person, visitor or associate of such person with respect to housing because of racial status. Such discrimination includes, *inter alia* enacting and enforcing rules that discriminate against African Americans.  Defendant should be further enjoined from unlawfully coercing, intimidating and interfering with an individual in the exercise or enjoyment of rights granted or protected by the Fair Housing Act, including but not limited to retaliating against any person because that person has made a complaint, testified, assisted or participated in any manner in a proceeding under the Act . This includes, but is not limited to, assessing African American unit owners the costs or expenses in litigating or resolving this matter,

E.  Order Defendants to provide a notice to all current or prospective owners of their right to be free from discrimination based upon their racial status.

F.  Order Defendants to establish uniform and objective policies and procedures for the rules and regulations of the Ibis community.

G. Order that Defendants submit a copy of these policies and procedures to plaintiffs and this court for review and approval .

H. Order that the Defendants instruct all employees, agents, independent contractors and/or other persons who deal with the sale or management of properties in the Ibis community, at the conclusion of this case and for the next ten years, of the terms of the Court's Order and the Fair Housing Act, Fair Housing Amendments Act and implementing regulations .

I. Grant any other such relief as this Court deems just and equitable .

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated this 1st  day of September, 2017

Respectfully submitted,


/s/Neil Tygar_____
 Neil Bryan Tygar, P.A.
Counsel for Plaintiff
5341 W. Atlantic Ave. #303
Delray Beach, FL 33130
Tel:     561-455-0280 Ext. 11
Fax:     561-455-0281
Cell:    561-305-5214
ntygar@me.com